*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
April 11, 2024

Plaintiff-Appellee,

v

No. 360109
Berrien Circuit Court
LC No. 2015-003300-FC

WILLIAM TROY STANSON,

Defendant-Appellant.

Before: CAVANAGH, P.J., and K. F. KELLY and RICK, JJ.

PER CURIAM.

Defendant, William Troy Stanson, appeals as of right his convictions and sentences for four counts of first-degree criminal sexual conduct (CSC-I), MCL 750.520b(1)(b) and (2)(b). The trial court sentenced defendant to 25 to 60 years' imprisonment for the first two CSC-I convictions and to 210 months to 720 months' imprisonment for the third and fourth counts of CSC-I. The trial court sentenced defendant to serve the first three counts concurrently but sentenced defendant to serve the fourth count consecutive to the third count. We affirm defendant's convictions but remand is required, as the prosecution concedes, so that the trial court can articulate its rationale for the imposition of the consecutive sentence.

## I. BASIC FACTS

This case arises from defendant's convictions on four counts of CSC-I for his conduct toward his daughter, KG, both before and after defendant was married to KG's mother. Defendant had three children with KG's mother: KG, WG, and TG. Defendant and KG's mother divorced after 13 years of marriage and split custody of the three children. Defendant only asked for sole custody of KG during the divorce. After the divorce, KG started living full-time with defendant when her relationship with her mother became strained. KG testified that her relationship with her mother became strained because defendant manipulated her into believing that KG's mother was an evil person.

At trial, KG testified that both before and after the divorce, she was sexually abused by defendant. She testified that sometime between the ages of three and five, defendant started sexually abusing her and continued to sexually abuse her until age 16. Throughout this time, KG

-1-

testified, she engaged in regular sexual activity with defendant and estimated that she engaged in 1,500 to 1,600 sexual acts with defendant.

KG testified about several instances in which she engaged in sexual acts with defendant. First, she testified that, between the ages of 8 and 12, she performed oral sex on defendant after defendant wrapped a fruit-roll up around his penis. He did this to entice her to perform oral sex because she did not enjoy performing oral sex. Second, KG testified that during her parents' pending divorce, she lost her virginity to defendant at age 12. Third, KG testified that when she was 13 or 14 years old, defendant told her that she did not need to go to school if she performed oral sex on him. KG agreed and performed oral sex on defendant. She then engaged in penile-vaginal intercourse with defendant. KG testified that she made this exchange with defendant more than once to skip school.

KG became pregnant by defendant at age 16. Defendant drove her to Indiana to get an abortion. Defendant coached her to tell the clinicians that she became pregnant from having sex with a friend's cousin. The medical records from this abortion were submitted into evidence. In addition to these records, the prosecution presented testimony from Sexual Assault Nurse Examiner Coordinator Teresa Yoakum, who performed an internal and external examination of KG. Coordinator Yoakum saw that KG had two transections on her hymen and hymen thinning. She explained that such transections are usually caused by some sort of penetration and that those transections likely occurred below the age of puberty. Additionally, Brook Rospierski, a forensic interview specialist employed by the Children's Advocacy Center, testified as an expert in forensic interviewing, the process of disclosure, and the characteristics of child sexual abuse victims at trial.

KG described how she perceived her relationship with defendant. She considered herself to be in an "intimate" relationship with defendant "similar to like a wife and husband." KG explained that she performed the chores in defendant's household and cared for her siblings like she was their parent. In the various houses that defendant had after the divorce, KG slept in defendant's bed. WG corroborated this testimony with his testimony that he saw KG sleep in defendant's bed and that, at some point, defendant placed a lock on defendant's bedroom. WG also testified that KG took a motherly role toward himself and TG.

In 2014, defendant was charged with four counts of accosting a child for immoral purposes, MCL 750.145a; and two counts of furnishing alcohol to a minor, MCL 436.1701, for his behavior at a Halloween party. Several of KG's friends came to defendant's house for the party. Defendant drank at this party and gave alcohol to several of the teenage participants. Defendant also participated in the teenage girls' games of "never have I ever" and "truth or dare." During these games, defendant told the teenage girls that he had sex with his babysitter. Defendant both made dare requests and participated in the dares. One of the participants accepted a dare to give defendant a lap dance. Defendant sat in a chair. The participant faced away from defendant, danced, and flashed her breasts to the girls in the room. In another dare, KG switched bras under her shirt with another girl. KG also licked defendant's stomach. Defendant dared a participant to place a pretzel stick in her vagina and eat it in front of the room. When this dare was refused, defendant changed the request to the participant placing the pretzel stick in her mouth and letting defendant eat the other half. Another participant took defendant's beanie hat off his head, placed it on her breast, and then defendant placed it back on his head.

After this party, several of the participants told their parents, and an investigation of defendant was opened. During a police interview, defendant admitted that he mixed an alcoholic drink and left it unattended. He also admitted that KG licked his stomach and that one of the participants gave defendant a lap dance. In the months after the Halloween party, KG told her friend that defendant sexually abused her. With this friend's encouragement, KG disclosed to her mother that defendant sexually abused her. After these disclosures, KG and her mother went to the police to make a complaint.

In July 2015, after KG made a complaint against defendant, Michigan State Police Trooper Jeff Baublit called defendant and asked him to come to the police station for an interview. Defendant drove himself to the police station for the interview. Trooper Baublit attempted to record the interview through two methods: a video camera and an audio recorder. The video camera did not record the interview, but the audio recorder successfully captured the audio of the interview. The interview took place on July 17, 2015, at approximately 9:00 p.m. and lasted approximately 100 minutes.

Trooper Baublit told defendant that he was investigating CSC claims that KG made against defendant. Trooper Baublit and defendant discussed the Halloween party and KG's behavior early in the interview. Trooper Baublit transitioned to questioning defendant about KG's allegations, asking defendant through various tactics if he had sex with KG. For the first hour of the interview, defendant repeatedly denied that he had sex with KG. Trooper Baublit appealed to defendant's faith in Christianity, told defendant that he knew he was lying, asserted that defendant wanted to get something off his chest, and directly asked defendant if he had sex with KG or raped her. Trooper Baublit also lied to defendant by telling him that the police had DNA evidence from KG's abortion. Trooper Baublit testified that he was "pretty firm" with defendant and raised his voice during the interview.

Ultimately, defendant admitted that he shared a loving relationship with KG that included "intimacy." When asked to explain what intimacy meant, defendant became emotional and stated that intimacy meant he was going to jail. Defendant also asked Trooper Baublit to "ask me if I've made love to my daughter." When Trooper Baublit asked this question, defendant admitted that he made love to KG and slept in the same bed with her. Defendant wrote out a statement before leaving the police station and going home: "My daughter, [KG], and I had an intimate relationship involving intercourse. We never intended on it. It just happened. I do not recall how many times." Below the word "intercourse," defendant wrote the word "normal."

Approximately a week after this interview, Trooper Baublit executed an arrest warrant at defendant's house. Trooper Baublit found various notes left throughout the house for defendant's children, as well as presents and a voice recording. Among other statements that defendant recorded, defendant told KG, "I love you [KG], I've loved you forever. I believed we were in this together. Wrong again." Defendant was not arrested because he already fled the country to Mexico. Defendant lived and worked in Mexico for the next five years before he was apprehended and extradited to the United States to stand trial.

Defendant was convicted and sentenced, as stated above. Defendant now appeals.

## II. INVOLUNTARY CONFESSION

Defendant first contends that his inculpatory statements were elicited during a custodial interrogation without *Miranda* warnings[1] and that the statements were involuntary. Additionally, defendant contends that trial counsel was ineffective for failing to object to admission of his inculpatory statements. We disagree.

In support of his argument, defendant provided this Court with an affidavit in which he makes various assertions about the conditions of his interview with Trooper Baublit in 2015. This affidavit was first provided to this Court unsigned in September 2023. Then defendant executed a signed version in December 2023 and provided it to this Court. The affidavit is an attempt to expand the record without filing a motion to expand the lower court record in this Court. See *People v Powell*, 235 Mich App 557, 561 n 4; 599 NW2d 499 (1999).

Defendant asserts that the signed affidavit is not an attempt to expand the record because the unsigned affidavit was attached to his postjudgment motion for a new trial or evidentiary hearing in the trial court. An "affidavit" is defined as "a voluntary declaration of facts written down and sworn to by a declarant, usu[ally] before an officer authorized to administer oaths." *Black's Law Dictionary* (11th ed). "[A]n unsigned, unnotarized 'affidavit' is no affidavit at all" and an "unsworn, unsigned affidavit may not be considered by the trial court on a motion for summary disposition." *Rataj v Romulus*, 306 Mich App 735, 755 n 8; 858 NW2d 116 (2014) (quotation marks and citations omitted). Accordingly, this unsigned document is not an affidavit at all. Even if we accepted that the trial court could consider the unsigned document as an affidavit, defendant failed to establish that the trial court considered this document when it denied defendant's motion. In our review of the record, the unsigned document was not attached to defendant's motion for a new trial or an evidentiary hearing. Accordingly, we do not consider defendant's affidavit in our review of these issues.

### A. *MIRANDA* WARNINGS

There is no dispute that the inculpatory statements were the result of interrogation. However, the parties dispute whether defendant was in custody. Typically, "[w]hether a person is in custody for purposes of the *Miranda* warnings requirement is a mixed question of law and fact that must be answered independently after a review of the record de novo." *People v Cortez*, 299 Mich App 679, 691; 832 NW2d 1 (2013). However, because defendant did not preserve this issue at trial, this Court's review is for plain error affecting substantial rights. See *People v Cain*, 498 Mich 108, 116; 869 NW2d 829 (2015).

Both the United States and Michigan Constitutions guarantee the right against self-incrimination. US Const, Am V; Const 1963, art 1, § 17. To protect this right, police officers must generally precede "custodial interrogation" with adequate *Miranda* warnings. *Cortez*, 299 Mich App at 691. "Statements made by a defendant to the police during a custodial interrogation are not admissible unless the defendant voluntarily, knowingly, and intelligently waives the constitutional right against self-incrimination." *People v Barritt*, 325 Mich App 556, 561-562;

---

[1] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

926 NW2d 811 (2018). However, "voluntarily given confessions that are not the result of impermissible custodial interrogations remain admissible." *People v White*, 493 Mich 187, 194; 828 NW2d 329 (2013).

To determine whether a defendant is in custody for purposes of *Miranda*, "courts consider both whether a reasonable person in the defendant's situation would believe that he or she was free to leave and whether the relevant environment present[ed] the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Cortez*, 299 Mich App at 692 (quotation marks and citation omitted; alteration in original). This Court must examine all the circumstances surrounding the interrogation, which include:

> the location of the questioning, (2) the duration of the questioning, (3) statements made during the interview, (4) the presence or absence of physical restraints during the questioning, and (5) the release of the interviewee at the end of the questioning. [*Barritt*, 325 Mich App at 562-563 (citations omitted).]

"[N]o one circumstance is controlling; rather, a reviewing Court must consider the totality of the circumstances . . . ." *Id*. at 563. " '[T]he initial determination of custody depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.' " *Id*. at 568, quoting *Stansbury v California*, 511 US 318, 323; 114 S Ct 1526; 128 L Ed 2d 293 (1994). For purposes of *Miranda*, interrogation refers to "express questioning and to any words or actions on the part of police that the police should know are reasonably likely to elicit an incriminating response from the subject." *People v Raper*, 222 Mich App 475, 479; 563 NW2d 709 (1997).

Defendant was not in custody during his interview with Trooper Baublit. First, addressing the location of the interview, this interview took place at a police station. A police station is a "police-dominated atmosphere." *Miranda v Arizona*, 384 US 436, 445; 86 S Ct 1602; 16 L Ed 2d 694 (1966). However, the fact that a police interview took place in a police station is not dispositive. *Oregon v Mathiason*, 429 US 492, 495; 97 S Ct 711; 50 L Ed 2d 714 (1977). Trooper Baublit called defendant and asked him to come to the police station. Defendant chose to drive himself to the police station to speak with Trooper Baublit. When defendant arrived at the police station, he was brought back to an unlocked room and sat across a table from Trooper Baublit to discuss KG's allegations. The door to the interview room was unlocked. This factor favors a determination that defendant was not in custody.

Second, with regard to the length of questioning, this factor is neutral. Defendant was interviewed for approximately 100 minutes. In *Barritt*, 325 Mich App at 569, this Court determined that an approximately 90-minute interview was a neutral factor in the custody determination. This Court also noted that the United States Supreme Court determined that a two-hour interview weighed in favor of finding that a defendant was in custody. *Id*., citing *Yarborough v Alvarado*, 541 US 652, 665; 124 S Ct 2140; 158 L Ed 2d 938 (2004). The length of the interview in this case is closer to the length of the interview in *Barritt* than *Yarborough*.

Third, with regard to the statements made during the interview, this fact favors a determination that defendant was not in custody. "[F]ailure to tell a suspect that he or she is free to leave is one factor that can contribute to a finding that a suspect was in custody." *Barritt*, 325

Mich App at 570. Additionally, the "increasingly accusatory nature of the interview weighed in favor of a finding of custody." *Id*. at 571. At the start of the interview, Trooper Baublit advised defendant that he was not under arrest and that he was free to leave the station at any time. Later in the interview, Trooper Baublit again advised defendant that he would go home at the end of the night even if defendant told him that he murdered someone. Trooper Baublit directly asked defendant if he raped or had sex with KG. In addition to these direct questions, Trooper Baublit appealed to defendant's faith, told defendant that he thought he was lying, and said that defendant looked like he needed to get something off his chest. Even with these direct accusations, review of the recording shows that Trooper Baublit did not yell at defendant or swear at defendant. He did not threaten defendant with arrest. Instead, the questioning was conducted in a calm manner.

Fourth, with regard to physical restraints, this factor weighs against a determination that defendant was in custody. Defendant was not placed in handcuffs at any point before or during the interview. The door to the room was closed, but unlocked. Indeed, after the interview concluded, defendant got up and left the police station. Finally, the fact that defendant was released at the end of the interview weighs against a determination that defendant was in custody.

Each factor is either neutral or favors a determination that defendant was not in custody. Considering the totality of the circumstances, defendant was not in custody. Accordingly, Trooper Baublit was not required to read defendant his *Miranda* rights, and defendant's inculpatory statements did not need to be suppressed. See *id*. at 561-562.

## B. VOLUNTARY CONFESSION

"When reviewing a trial court's determination of the voluntariness of inculpatory statements, this Court must examine the entire record and make an independent determination, but will not disturb the trial court's factual findings absent clear error." *People v Shipley*, 256 Mich App 367, 372-373; 662 NW2d 856 (2003). Because defendant did not preserve this issue at trial, this Court's review is for plain error affecting substantial rights. See *Cain*, 498 Mich at 116.

Due process of law and the right against self-incrimination is guaranteed by both the United States and Michigan Constitutions. US Const, Am V and XIV; Const 1963, art 1, § 17. "[T]he use of an involuntary statement in a criminal trial, either for impeachment purposes or in the prosecution's case in chief, violates due process." *People v Cipriano*, 431 Mich 315, 331; 429 NW2d 781 (1988). "If an individual's will was overborne or if his confession was not the product of a rational intellect and a free will, his confession is inadmissible because [it was] coerced." *People v Stewart*, 512 Mich 472, 480; 999 NW2d 717 (2023) (quotation marks, alteration, and citation omitted). Physical intimidation and psychological pressure are coercive tactics that can overbear an individual's will. *Id*.

When determining whether a statement was involuntary, a reviewing court must consider "whether the totality of the circumstances surrounding the making of the confession indicates that it was freely and voluntarily made." *Cipriano*, 431 Mich at 334. Our Supreme Court directed courts to consider a variety of factors, including:

> the age of the accused; his lack of education or his intelligence level; the extent of his previous experience with the police; the repeated and prolonged nature of the questioning; the length of the detention of the accused before he gave the statement

in question; the lack of any advice to the accused of his constitutional rights; whether there was an unnecessary delay in bringing him before a magistrate before he gave the confession; whether the accused was injured, intoxicated or drugged, or in ill health when he gave the statement; whether the accused was deprived of food, sleep, or medical attention; whether the accused was physically abused; and whether the suspect was threatened with abuse. [*Id*.]

An additional consideration outside these factors is promises of leniency. *People v Conte*, 421 Mich 704, 724-725; 365 NW2d 648 (1984).

Defendant has failed to show the necessary predicate that his statements were the product of police coercion. First, with regard to defendant's age and mental acuity, nothing in the record demonstrates that defendant was compromised. At 49 years old, none of the concerns of youth present for the 18-year-old defendant in *Stewart*, 512 Mich at 490, such as continuing "physiological and neurological maturation," were present. Defendant had a high school education and ran his own business. Accordingly, these factors favor a determination of voluntariness.

Second, the length of the interview and repeated nature of the questioning was not coercive. The interview was approximately 100 minutes long. As discussed above, Trooper Baublit used varying tactics to ask defendant if he had sex with KG over the course of the interview; however, the nature of the questioning was not so repetitive or prolonged that it suggested that defendant's statements were involuntary.

There is no evidence that defendant was deprived of food, sleep, or medical attention. Likewise, there is no evidence that defendant was physically abused or threatened with abuse. Defendant was not restrained at any point during the questioning. Defendant brought himself to the police station, so there was no point at which defendant was detained or put in front of a magistrate.

Outside of these factors, defendant asserts that the fact that Trooper Baublit lied to him influenced the involuntariness of his statements. This fact can influence whether a defendant's statement is voluntary, but it does not necessarily render an otherwise voluntary statement involuntary. See *People v Hicks*, 185 Mich App 107, 113; 460 NW2d 569 (1990). In this case, Trooper Baublit lied to defendant once when he told him that the clinic that performed KG's abortion provided the police with DNA evidence that would show that defendant was the father. Trooper Baublit only used this tactic once, and it did not result in defendant immediately making inculpatory statements to Trooper Baublit. Outside of this single instance, it is not apparent that Trooper Baublit lied to defendant elsewhere. Accordingly, this instance of deceptive tactics did not impact the voluntariness of defendant's inculpatory statements made later in the interview.

In sum, the totality of the circumstances surrounding defendant's inculpatory statements supports the conclusion that they were freely and voluntarily made. Because these statements were properly admitted at trial, we decline to address the remainder of plain-error review with regard to defendant's *Miranda* claim and coerced-confession claim. See *Cain*, 498 Mich at 116.

## C. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant contends that trial counsel was ineffective for failing to file a motion to suppress his inculpatory statements from his interview with Trooper Baublit. We disagree.

A defendant's ineffective-assistance-of-counsel claim "is a mixed question of fact and constitutional law." *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002). This Court reviews the trial court's findings of fact for clear error, while it reviews questions of law de novo. *People v Trakhtenberg*, 493 Mich 38, 47; 826 NW2d 136 (2012). When there has been no evidentiary hearing held below, this Court's review is limited to mistakes that are apparent on the record. *People v Gioglio (On Remand)*, 296 Mich App 12, 20; 815 NW2d 589 (2012), vacated not in relevant part 493 Mich 864 (2012). "If the record does not contain sufficient detail to support defendant's ineffective assistance claim, then he has effectively waived the issue." *People v Davis*, 250 Mich App 357, 368; 649 NW2d 94 (2002).

Both the United States and Michigan Constitutions guarantee a defendant the right to effective assistance of counsel. US Const, Am VI; Const 1963, art 1, § 20. This state has adopted the federal constitutional standard for an ineffective assistance of counsel claim as set forth in *Strickland v Washington*, 466 US 668, 687; 104 S Ct 2052; 80 L Ed 2d 674 (1984). *People v Carbin*, 463 Mich 599-600; 623 NW2d 884 (2001). To obtain a new trial, a defendant must establish that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich at 51. Counsel's performance is evaluated at the time of the alleged error without the benefit of hindsight. *People v Grant*, 470 Mich 477, 487; 684 NW2d 686 (2004).

Even in defendant's attempt to expand the record on appeal, defendant did not assert that he informed his attorney that his statements to Trooper Baublit were not voluntary. Nothing in the record suggests that defendant communicated to trial counsel that his confession was involuntary. Given the atmosphere of the audio recording, trial counsel had no reason to suspect that defendant gave a coerced confession and would need to investigate further. Accordingly, defendant cannot establish that his counsel's performance fell below an objective standard of reasonableness. See *Trakhtenberg*, 493 Mich at 51.

Likewise, defendant cannot establish that but for his counsel's deficient performance, there is a reasonable probability that the outcome would have been different. Beyond the inculpatory statements that defendant made to Trooper Baublit, an overwhelming amount of evidence supported defendant's convictions on the four counts of CSC-I. The evidence in this case without the taped confession includes KG's compelling testimony that defendant regularly engaged in sexual activity with her starting when she was approximately three to five years old. Her testimony included discussion of particular sexual acts and behavior corresponding to hiding defendant's behavior. Her testimony regarding sleeping in defendant's bed was corroborated by WG. Further, WG testified that defendant placed a lock on defendant's bedroom.

The jury heard extensively about defendant's inappropriate sexual behavior at a Halloween party for teenagers, including that defendant let a teenage girl perform a lap dance on him and dared a girl to place a pretzel in her vagina. Witness testimony was also corroborated by record

-8-

and physical evidence. The jury saw the medical records from KG's abortion and heard testimony that it was likely that KG's vagina was penetrated before puberty.

Beyond this, the jury heard that defendant acted in an inculpatory manner after the police interview. After his interview with Trooper Baublit, defendant left gifts and an audio recording for his children, before fleeing the country. In the audio recording, defendant made another inculpatory statement that he thought that he and KG were in this together. Likewise, the fact that defendant fled to Mexico for approximately five years after he participated in the interview supported defendant's convictions. See *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995) (evidence of flight may indicate consciousness of guilt). Together, this evidence supported defendant's convictions even without reference to his confessions to Trooper Baublit.

## III.  VOUCHING FOR CREDIBILITY

Defendant contends that expert witness Brook Rospierski impermissibly vouched for KG at trial when she testified that "around 90 percent of kids are sexually touched by someone they know and love," implying that 90% of all children are victims of sexual abuse at the hands of someone they know and love, and, as a consequence, KG, as a child, was likely a victim of sexual abuse by someone she knew and loved. Defendant misconstrues Rospierski's testimony, and we disagree that Rospierski engaged in credibility vouching.

Because defendant did not preserve this issue, this Court's review is for plain error affecting substantial rights. See *Cain*, 498 Mich at 116. "It is generally improper for a witness to comment or provide an opinion on the credibility of another witness, because credibility matters are to be determined by the jury." *People v Dobek*, 274 Mich App 58, 71; 732 NW2d 546 (2007). An expert witness may not vouch for the credibility of the victim. *Id*. This type of testimony is "improper because it comes too close to testifying that the particular child is a victim of sexual abuse." *People v Peterson*, 450 Mich 349, 374; 537 NW2d 857 (1995). However, expert testimony is generally admissible when it describes the "typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an actual abuse victim . . . ." *Id*. at 352. Our Supreme Court has identified several types of inconsistent behaviors that an expert may address, including "delay in reporting, recantation, accommodating the abuser or secrecy." *Id*. at 373 n 12. Further, "an expert may testify with regard to the consistencies between the behavior of the particular victim and other victims of child sexual abuse to rebut an attack on the victim's credibility." *Id*. at 352-353.

Defendant compares the expert testimony in this case to the expert testimony discussed in the consolidated cases *People v Thorpe* and *People v Harbison*, 504 Mich 230; 934 NW2d 693 (2019). In *Harbison*, the expert doctor testified that her examination of the victim showed no physical evidence of sexual assault but concluded that the victim suffered pediatric sexual abuse solely on the basis of her own opinion that the victim's account of the assault was reliable. *Id*. at 262. The Court held that

> examining physicians cannot testify that a complainant has been sexually assaulted
> or has been diagnosed with sexual abuse without physical evidence that
> corroborates the complainant's account of sexual assault or abuse because such

testimony vouches for the complainant's veracity and improperly interferes with the role of the jury. [*Id*. at 235.]

In *Thorpe*, the expert doctor testified that the rate of false reports of sexual abuse by children was between 2% and 4% and that "[w]hen children lie, they lie with a purpose." *Id*. at 240. The expert explained two scenarios in which children are likely to lie about sexual abuse. *Id*. The defendant's trial was a "true credibility contest" because no physical evidence was presented, no other witnesses alleged assault, and there were no inculpatory statements. *Id*. at 260. The Court explained that the expert did not directly say that there was zero chance that the victim lied, but essentially concluded so, bolstering the victim's credibility. *Id*. at 259.

Defendant misconstrues the record when he asserts that Rospierski testified that 90% of all children are sexually abused by someone they know and love. Instead, when viewed in the context of the record, Rospierski testified that 90% of children who are sexually abused are abused by someone they know and love. Rospierski testified about this statistic in the context of explaining the many reasons that a child may delay disclosure of sexual abuse. Through this testimony, Rospierski did not state that any of the potential reasons for delay applied specifically to KG, nor did she imply that a relationship KG had with someone she knew and loved made it more likely that KG was telling the truth at trial. The prosecution may present evidence to generally explain "typical and relevant symptoms of child sexual abuse for the sole purpose of explaining a victim's specific behavior . . . ." *Peterson*, 450 Mich at 352. Rospierski's testimony was properly admitted to inform the jury of the reasons that children delay disclosure.

Additionally, defendant contends that the prosecution engaged in witness vouching when it reminded the jury of Rospierski's testimony during closing argument. Defendant contends that the impermissible testimony was further exacerbated because the prosecution relied on it during closing arguments to explain KG's "flat affect" and delayed disclosure. We disagree.

Defendant is referring to when the prosecution explained that KG testified with a "flat affect" and reminded the jury that there were many legitimate reasons why a child may not disclose sexual abuse right away. Specifically, the prosecution argued that KG was involved in a relationship with defendant that she viewed as normal. Defendant asserts that these arguments coupled with Rospierski's testimony further prejudiced defendant. Again, we disagree.

The prosecution did not assert in closing argument that KG was less likely to lie about sexual abuse because she had a flat affect when testifying or because she delayed disclosure. Instead, the prosecution reminded the jury of Rospierski's testimony that there is a common misconception that children disclose sexual abuse right away. "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v Wainwright*, 477 US 168, 181; 106 S Ct 2464; 91 L Ed 2d 144 (1986) (quotation marks and citation omitted). "A prosecutor may not make a factual statement to the jury that is not supported by the evidence, but he or she is free to argue the evidence and all reasonable inferences arising from it as they relate to his or her theory of the case[.]" *Dobek*, 274 Mich App at 66 (citations omitted). "Generally, prosecutors are given great latitude regarding their arguments . . . ." *People v Mullins*, 322 Mich App 151, 172; 911 NW2d 201 (2017). Further, the jury heard during final jury instructions that the parties' closing arguments are not evidence. "[J]urors are presumed to follow their instructions." See *People v Graves*, 458 Mich 476, 486;

-10-

581 NW2d 229 (1998). See also *Weeks v Angelone*, 528 US 225, 234; 120 S Ct 727; 145 L Ed 2d 727 (2000). Ultimately, the prosecution referred to Rospierski's testimony to dispel the notion that a delayed disclosure and flat affect were inconsistent with a child experiencing sexual abuse. She did not refer to Rospierski's testimony to contend that KG was a victim because she had a flat affect or because she delayed disclosure. Accordingly, defendant is not entitled to relief for this issue. Because it was not error to admit Rospierski's testimony or the prosecution's statements during closing argument, we decline to address the remainder of the plain-error analysis for this issue. See *Cain*, 498 Mich at 116.

Additionally, defendant contends that trial counsel was ineffective for failing to object to Rospierski's testimony and the prosecution's remarks during closing arguments. However, because both Rospierski's testimony and the prosecution's remarks were proper, trial counsel was not ineffective for failing to object at trial. See *People v Matuszak*, 263 Mich App 42, 58; 687 NW2d 342 (2004) (counsel is not ineffective for failing to make meritless objections).

## IV. OTHER-ACTS EVIDENCE

Defendant challenges the constitutionality of MCL 768.27a and asserts that other-acts evidence admitted under that statute should have been excluded under MRE 403. We disagree.

## A. CONSTITUTIONALITY OF MCL 768.27A

First, defendant contends that MCL 768.27a violates the separation-of-powers doctrine because the Legislature infringed on the judiciary's authority to create this state's rules of evidence when it permitted other-acts evidence to be admitted under that statute. Defendant's argument is without merit.

Because defendant did not preserve the issue whether MCL 768.27a violates the separation-of-powers doctrine for appellate review, this Court's review is for plain error affecting substantial rights. See *Cain*, 498 Mich at 116. Generally, under MRE 404(b)(1),[2] "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." However, MCL 768.27a provides in relevant part:

> [I]n a criminal case in which the defendant is accused of committing a listed offense against a minor, evidence that the defendant committed another listed offense against a minor is admissible and may be considered for its bearing on any matter to which it is relevant.

Under this statute, a "listed offense" means a Tier I, Tier II, or Tier III offense as defined in MCL 28.722. MCL 768.27a(2)(a). Those listed offenses include CSC-I, MCL 28.722(v)(*iv*), as well as accosting a child for immoral purposes, MCL 28.722(t)(*i*).

---

[2] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See ADM File No. 2021-10, 512 Mich lxiii (2023). We rely on the version of the rules in effect at the time of trial.

Our Supreme Court concluded that MRE 404(b) must yield to MCL 768.27a, which was a valid enactment of substantive law. *People v Watkins*, 491 Mich 450, 475; 818 NW2d 296 (2012). In that decision, the Court expressly rejected this same separation-of-powers argument when it held that the statute "prevails over [MRE 404(b)] because it does not impermissibly infringe on this Court's authority regarding rules of practice and procedure under Const 1963, art 6, § 5." *Id*. at 455-456. Defendant asserts that *Watkins* was wrongly decided; however, this Court is bound to follow the decisions of the Michigan Supreme Court. *People v Walker*, 330 Mich App 378, 386 n 3; 948 NW2d 122 (2019). Because the trial court adhered to binding authority when it admitted other-acts evidence under MCL 768.27a, no error was committed.

## B. MRE 403

Second, defendant contends that admission of various other-acts evidence at trial was an abuse of discretion. Specifically, defendant takes issue with other-acts evidence concerning KG's testimony that she engaged in hundreds of sexual acts with defendant over the course of the sexual abuse; that defendant allowed KG to skip school if she performed oral sex on him; that KG and defendant did not use birth control; that KG was impregnated by defendant and got an abortion; and that defendant engaged in sexually inappropriate behavior at the Halloween party. Defendant contends that the probative value of this evidence was substantially outweighed by its unfair prejudice and resulted in confusion of the issues and the presentation of cumulative evidence. We disagree.

"The decision whether to admit evidence falls within a trial court's discretion and will be reversed only when there is an abuse of that discretion." *People v Duncan*, 494 Mich 713, 722; 835 NW2d 399 (2013). A trial court abuses its discretion when its decision "falls outside the range of reasonable and principled outcomes." *People v Unger*, 278 Mich App 210, 217; 749 NW2d 272 (2008).

Evidence admissible under MCL 768.27a is subject to the admissibility requirements of MRE 403. *Watkins*, 491 Mich at 489. At the time of trial, MRE 403 stated in full:

> Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The *Watkins* Court provided guidance to trial courts in applying the balancing test of MRE 403 to evidence admissible under MCL 768.27a. First, the trial court "must weigh the propensity inference in favor of the evidence's probative value rather than its prejudicial effect." *Watkins*, 491 Mich at 487. Second, the Supreme Court provided a nonexhaustive list of factors that may lead the trial court to exclude evidence under MRE 403 as overly prejudicial:

> (1) the dissimilarity between the other acts and the charged crime, (2) the temporal proximity of the other acts to the charged crime, (3) the infrequency of the other acts, (4) the presence of intervening acts, (5) the lack of reliability of the evidence supporting the occurrence of the other acts, and (6) the lack of need for evidence beyond the complainant's and the defendant's testimony. [*Id*. at 487-488.]

-12-

"Evidence is not unfairly prejudicial under MRE 403 merely because it damages a party's case." *People v Buie*, 298 Mich App 50, 73; 825 NW2d 361 (2012). Additionally, in cases involving the sexual abuse of a minor, the prosecution may introduce other uncharged acts of sexual abuse that occurred under similar circumstances to the abuse at issue. *People v Duenaz*, 306 Mich App 85, 100; 854 NW2d 531 (2014).

Defendant contends that KG's testimony that she engaged in hundreds of sexual acts with defendant lacked specificity, which caused confusion and misuse, and was needlessly cumulative. First, it is unlikely that the jury was confused by this other-acts evidence. The facts presented at trial were not complex. Defendant was charged with four particular acts of CSC-I that occurred within the course of a sexually abusive relationship between defendant and KG. The jury was instructed that defendant was charged with four particular acts of CSC-I. Further, the jury was instructed that the prosecution introduced other-acts evidence against defendant that the jury could consider when deciding if defendant committed the charged offenses. Within this instruction, the trial court explained that the jury could not convict defendant solely because of its belief that defendant committed the bad acts. The jury is presumed to follow its instructions. See *Graves*, 458 Mich at 486. Likewise, this evidence was not needlessly cumulative because it provided the jury with the context and timing of the four charged offenses within KG's account of being a victim of consistent sexual abuse. The prosecution presented this testimony to provide the jury with the full picture of defendant's pervasive sexual abuse of KG over many years. Accordingly, the trial court did not abuse its discretion when it admitted this other-acts evidence.

Next, defendant contends that the remainder of the other-acts evidence had minimal probative value which was substantially outweighed by its unfair prejudice. First, the other-acts evidence that defendant allowed KG to skip school if she performed oral sex on him, that KG and defendant did not use birth control, and that KG was impregnated by defendant and got an abortion had probative value that was not substantially outweighed by unfair prejudice to defendant. Evidence that defendant impregnated KG and that he exchanged oral sex for skipping school both indicate that defendant engaged in a routine course of sexual behavior with KG. The probative value of these other acts was enhanced by the record evidence of KG's poor attendance at school and medical records of her abortion that occurred in Indiana.

Further, under the *Watkins* balancing test, the trial court may consider the "lack of need for evidence beyond the complainant's and the defendant's testimony." *Watkins*, 491 Mich at 487-488. This factor "asks whether the other-acts evidence is important to the prosecution's case, particularly when there is no physical evidence of the crime or the victim's memory has faded." *People v Hoskins*, 342 Mich App 194, 209 n 8; 993 NW2d 48 (2022). In this case, there were no direct eyewitnesses to defendant's sexual assaults of KG. Testimony of these particular incidents and the corresponding records corroborated KG's claim that defendant sexually abused her in the four charged offenses within the course of a pervasive sexually abusive relationship. Further, these incidents were relevant to the prosecution's argument that defendant engaged in a pattern of sexual misconduct toward KG. Plainly, this evidence was prejudicial to defendant, but it was not so unduly prejudicial that it outweighed the probative value.

Finally, defendant contends that the probative value of the evidence that defendant engaged in sexually inappropriate behavior toward young girls at the Halloween party was substantially outweighed by unfair prejudice to defendant. The Halloween party was not exactly similar to the

charged offenses because the circumstances of the Halloween party did not involve acts of penetration. Regardless, the Halloween party was sufficiently similar because, like the charged offenses, it involved defendant preying on young women and, specifically KG, for sexual gratification. Defendant's involvement in the Halloween party games, including daring a minor to place a pretzel in her vagina and receiving a lap dance indicate the sexual gratification that defendant received from participating in the party games. Further, the aftermath of the Halloween party provided the jury with the timing and circumstances surrounding KG's disclosure to her friend and her mother. These acts were more probative than unfairly prejudicial.

## V. SENTENCING

Defendant raises two separate sentencing issues. First, defendant contends that despite its authority to sentence defendant consecutively, the trial court failed to articulate its reasoning for sentencing defendant consecutively in this case. As a consequence, defendant contends that he is entitled to remand so that the trial court may articulate its rationale for sentencing defendant consecutively. The prosecution agrees, as do we.

This Court reviews for an abuse of discretion a trial court's decision to impose discretionary consecutive sentences. *People v Norfleet*, 317 Mich App 649, 664; 897 NW2d 195 (2016). "In Michigan, concurrent sentencing is the norm, and a consecutive sentence may be imposed only if specifically authorized by statute." *People v Ryan*, 295 Mich App 388, 401; 819 NW2d 55 (2012) (quotation marks and citation omitted). "The purpose of consecutive sentencing is to *enhance* the punishment imposed upon those who have been found guilty of more serious crimes and who repeatedly engage in criminal acts." *People v Chambers*, 430 Mich 217, 229; 421 NW2d 903 (1988) (quotation marks, footnote, and citation omitted). "The decision regarding each consecutive sentence is its own discretionary act and must be separately justified on the record." *Norfleet*, 317 Mich App at 665. The trial court must articulate on the record its reasons for imposing a particular sentence in order to facilitate appellate review. *People v Broden*, 428 Mich 343, 350-351; 408 NW2d 789 (1987). Remand is necessary when the trial court fails to fully articulate its rationale for imposing consecutive sentences. See *Norfleet*, 317 Mich App at 666.

Defendant does not contest the trial court's authority to impose consecutive sentences under MCL 750.520b(3)[3] in this case. Despite its authority to do so, the trial court failed to articulate its reasoning for sentencing defendant consecutively. The trial court engaged in the following exchange with the parties before sentencing defendant consecutively:

> *The Court*: Counts one and two are concurrent to each other. The Court does find, pursuant to *People v Ryan*—wasn't that case that the case that we were discussing, [trial counsel]?
>
> [*Trial Counsel*]: I believe, yes, your Honor.

---

[3] MCL 750.520b(3) states that "[t]he court may order a term of imprisonment imposed under this section to be served consecutively to any term of imprisonment imposed for any other criminal offense arising from the same transaction."

> *The Court*: Yea. This was a single transaction, both fondling of the breasts and then sexual intercourse. So I will make count four consecutive to count three. Is that what the people are requesting, [the prosecution]?
>
> [*The Prosecution*]: Yes.

The trial court only stated that it had the authority to sentence defendant consecutively. Recitation of the trial court's authority to impose a consecutive sentence does not address how the particular facts of this case merit consecutive sentencing. This leaves this Court to speculate regarding the trial court's rationale, and thus, unable to determine whether the trial court abused its discretion. See *Broden*, 428 Mich at 350-351. Accordingly, defendant is entitled to remand so that the trial court can articulate its reasoning for consecutive sentencing. See *Norfleet*, 317 Mich App at 666.

Second, defendant contends that the trial court committed error when it relied on "victim closure" as an impermissible ground for sentencing. Specifically, defendant asserts that this ground does not fall under considerations of the offense and the offender and is not one of the enumerated *Snow* factors. We disagree with defendant's interpretation of the record.

This Court reviews for an abuse of discretion whether a trial court properly imposed a sentence that was proportionate to the offender and offense. See *People v Steanhouse*, 500 Mich 453, 459-460; 902 NW2d 327 (2017). See also *Graham v Florida*, 560 US 48, 59; 130 S Ct 2011; 176 L Ed 2d 825 (2010). However, because defendant did not object to the trial court using "victim closure" at sentencing, this Court's review is for plain error affecting substantial rights. See *Cain*, 498 Mich at 116.

A criminal sentence must be "proportionate to the seriousness of the circumstances surrounding the offense and the offender." *People v Milbourn*, 435 Mich 630, 636; 461 NW2d 1 (1990); see also *People v Posey*, 512 Mich 317, 355; 1 NW3d 101 (2023). Our Supreme Court has also listed some basic factors that are properly considered when crafting an appropriate sentence: "(a) the reformation of the offender, (b) protection of society, (c) the disciplining of the wrongdoer, and (d) the deterrence of others from committing like offenses." *People v Snow*, 386 Mich 586, 592; 194 NW2d 314 (1972). The Supreme Court reaffirmed the *Snow* factors in *People v Boykin*, 510 Mich 171, 183; 987 NW2d 58 (2022). The *Snow* factors "are not the only relevant sentencing criteria" and each factor need not necessarily be considered before imposing sentence. *Id*. at 183-184. "A sentence is invalid when it is beyond statutory limits, when it is based upon constitutionally impermissible grounds, improper assumptions of guilt, a misconception of law, or when it conforms to local sentencing policy rather than individualized facts." *People v Miles*, 454 Mich 90, 96; 559 NW2d 299 (1997).

Defendant mischaracterized the trial court's comments before sentencing defendant. KG expressed in her victim-impact statement that she would have a difficult time moving forward with her mental health because of defendant's conduct. The trial court dedicated much of its commentary on the record in response to KG, encouraging her to find closure after defendant was convicted and sentenced. The trial court concluded its commentary to KG as follows:

> So, it's just unfortunate, but lets [sic] all move forward, AS. Again, the purpose—and we say this in every felony sentence. The purpose of this sentence

is punishment, protection of community, deterrence, reformation, restitution. I'll add a sixth one today, victim closure. That's what you need to think about, is just victim closure. And everyone try to move on.

Directly after this statement, the trial court shifted topics to sentencing defendant within guidelines: "Okay, with that in mind, this is the guideline sentence. The purpose of this sentence is punishment, protection of the community, deterrence, reformation, and restitution."

Reading these statements in context, we do not agree with defendant's assertion that the trial court attempted to craft an additional *Snow* factor. Instead, a plain reading of this conversation suggests that the trial court first told KG that defendant's sentence, whatever the term may be, would serve the purpose of providing her with closure. Then the trial court transitioned into pronouncing defendant's sentences without reference to "victim closure." Given this reading of the trial court's statements, the trial court did not lengthen defendant's sentence by specifically considering "victim closure." Instead, as the trial court stated itself, the trial court considered "punishment, protection of the community, deterrence, reformation, and restitution" when it actually determined the length of defendant's sentences. Each of the listed considerations are permissible. The first four considerations are the *Snow* factors. See *Snow*, 386 Mich at 592. Restitution is not one of these factors, but is an additional punishment that may be applied in addition to a sentence. See MCL 780.766(2). Accordingly, the trial court did not commit error when fashioning defendant's sentences.

## VI. STANDARD 4 BRIEF

In his Standard 4 brief,[4] defendant raises a number of claims regarding discovery violations, prosecutorial misconduct, and ineffective assistance of counsel. We address each in turn.

## A. PROSECUTORIAL ERROR

First, defendant contends that the prosecution failed to disclose or suppressed the video recording of defendant's interview with Trooper Baublit, as well as evidence of defendant's e-mail, cellular device, and banking records. Additionally, defendant contends that the prosecution or police officers tampered with the audio recording of defendant's interview with Trooper Baublit. Defendant failed to establish the factual predicate for these claims.

Typically, this Court reviews due-process claims, such as an alleged *Brady*[5] violation, de novo. *People v Schumacher*, 276 Mich App 165, 176; 740 NW2d 534 (2007). Additionally, this Court generally reviews a claim of prosecutorial misconduct de novo to determine whether defendant was denied a fair trial. *People v Dunigan*, 299 Mich App 579, 588; 831 NW2d 243 (2013). Because defendant failed to preserve these issues in the trial court, this Court's review is for plain error affecting substantial rights. See *Cain*, 498 Mich at 116. "[T]he test for prosecutorial

---

[4] Filed pursuant to Supreme Court Administrative Order No. 2004-6, Standard 4.

[5] *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963).

-16-

misconduct is whether a defendant was denied a fair and impartial trial." *Dobek*, 274 Mich App at 63. "Issues of prosecutorial misconduct are decided case by case, and this Court must examine the entire record and evaluate a prosecutor's remarks in context." *Id.* at 64.

"Defendants have a due-process right to obtain evidence in the possession of the prosecutor if it is favorable to the accused and material to guilt or punishment." *People v Stanaway*, 446 Mich 643, 666; 521 NW2d 557 (1994). However, criminal defendants do not have a general constitutional right to discovery. *Id*. at 664 (citation omitted). The prosecution must provide "any written or recorded statements, including electronically recorded statements, by a defendant . . . pertaining to the case . . . ." MCR 6.201(B)(3). To the extent that defendant is arguing that the prosecution committed a constitutional violation pursuant to *Brady v Maryland*, 373 US 83, 87; 83 S Ct 1194; 10 L Ed 2d 215 (1963), he must establish: "(1) the prosecution has suppressed evidence; (2) that is favorable to the accused; and (3) viewed in its totality, is material." *People v Chenault*, 495 Mich 142, 155; 845 NW2d 731 (2014). "Evidence is favorable to the defense when it is either exculpatory or impeaching." *Id*. at 150. "[D]efendant bears the burden of providing this Court with a record to verify the factual basis of any argument upon which reversal [might be] predicated." *People v Everett*, 318 Mich App 511, 523; 899 NW2d 94 (2017) (quotation marks and citation omitted).

First, the record does not support defendant's assertion that the prosecution did not turn over the video camera recording of his interview because the video did not exist. At trial, Trooper Baublit testified that he used two devices to record defendant, but only the audio recording successfully captured the interview. The prosecution did not violate its mandatory discovery requirements because it failed to turn over a nonexistent video. See MCR 6.201(B)(3).

Second, defendant does not meet his burden for establishing a *Brady* violation regarding the video. Beyond the fact that the video did not exist, defendant did not establish that the video was exculpatory or favorable to his defense. See *Chenault*, 495 Mich at 150. Defendant asserts that the audio recording bolstered Trooper Baublit's credibility at trial. Beyond the obvious difference of one being a video recording and one being an audio recording, the two recordings would provide the same documentation of both Trooper Baublit's and defendant's statements during the interview. Trooper Baublit testified that he attempted to record the video and audio recordings at the same time. This record indicates that the video recording would have captured the exact same events as the audio recording. Outside suggesting that the audio recording was missing eight minutes, defendant does not explain what would have been contained in the video recording that was not also captured in the audio recording. Accordingly, this claim lacks merit.

Third, defendant does not meet his burden for establishing a *Brady* violation regarding the e-mail, cellular device, and banking records. In support of this claim, defendant simply refers to several instances in the record, where his counsel asked witnesses about various warrants for defendant's e-mail, cellular device, and bank records arising from the investigation of the CSC charges and search for defendant after he fled the country, as proof that the prosecution suppressed evidence. But reference to these instances without more cannot establish a *Brady* violation. See *id*. at 155. That is, these references do not establish that the prosecution suppressed evidence collected from these investigations. And nothing from the record suggests that trial counsel was surprised to learn that the police had warrants to search these records. The essence of a *Brady* violation is that the prosecution failed to disclose favorable evidence unknown to the defense. *Id*.

at 150, 153. Defendant would have first-hand knowledge of his own e-mail account, cellular device, and bank account—the very records he claims were suppressed. Moreover, while defendant asserts that these records would be exculpatory, he provides no explanation supporting that assertion.

Fourth, defendant argues that the prosecution or police engaged in misconduct by tampering with the audio recording of the interview played at trial. Defendant asserts, without any evidence of such, that at least eight minutes were missing from the audio recording at trial. Defendant had the burden of establishing the factual predicate for this assertion and failed to do so. See *Everett*, 318 Mich App at 523. Further, to establish plain error, defendant would need to show how such conduct was outcome-determinative. Defendant made no effort to explain what was contained in the purported missing eight minutes that would have had any effect at trial. "An appellant may not merely announce his position and leave it to this Court to discover and rationalize the basis for his claims, nor may he give only cursory treatment [of an issue] with little or no citation of supporting authority." *Matuszak*, 263 Mich App at 59 (quotation marks and citation omitted; alteration in original). Cursory treatment constitutes abandonment of the issue. *Id*.

Fifth, defendant contends that the police violated his due-process rights by failing to preserve the video recording of defendant's interview with Trooper Baublit. This claim is without merit.

In *Arizona v Youngblood*, 488 US 51, 55; 109 S Ct 333; 102 L Ed 2d 281 (1988), the United States Supreme Court addressed a category of claims that "might loosely be called the area of constitutionally guaranteed access to evidence." (Quotation marks and citation omitted). The Court considered the "extent to which the Due Process Clause of the Fourteenth Amendment requires the State to preserve evidentiary material that might be useful to a criminal defendant." *Id*. at 52. In that case, the Court concluded that police officers' failure to refrigerate clothing and perform tests on semen samples obtained from a sexual assault did not violate the defendant's due-process rights because this information was not concealed from the defendant, the evidence in its deteriorated state was made available to the defendant, and the defendant did not show evidence of bad faith from the police officers. *Id*. at 58. The Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." *Id*.

The record contains no suggestion that Trooper Baublit intentionally failed to record the interview with the video camera. In fact, the record indicates that Trooper Baublit showed a level of care because he also recorded the interview on a backup audio recording. His use of more than one method of recording rebuts the suggestion that Trooper Baublit intended to conceal what occurred during the interview. Because defendant did not show bad faith on the part of the police, the failure to preserve the video recording, potentially useful evidence, does not constitute a denial of due process of law. See *id*.

Sixth, defendant asserts that the prosecution engaged in misconduct by usurping the role of the trial court when it instructed the jury, using a PowerPoint presentation, as follows:

> The defendant is charged with four counts, they are listed there. I don't have them in order yet. You will see a lot of that in a minute, but as the Judge is

going to instruct you in just a little bit, my job as the prosecutor in the case is to prove each and every element of the charged offenses beyond a reasonable doubt. Don't worry about a lot of this because you are going to see a lot of the variable [sic] and elements up there, you are going to get a set of those instructions to go back with you so you don't have to memorize anything, you don't have to take notes, any of that sort of stuff. You are going to get a copy when you go back there, so a lot of this will be rehashing that.

Defendant misconstrues the record when he asserts that with this statement the prosecution instructed the jury. The prosecution merely explained that the jury members did not need to take notes during the prosecution's discussion of the applicable law in closing argument because the jury would receive a copy of the jury instructions. Accordingly, the prosecution did not usurp the trial court's role.

Likewise, the prosecution did not improperly use a PowerPoint presentation during closing argument. This Court has long held that attorneys may use visual aids during closing argument. *Campbell v Menze Constr Co*, 15 Mich App 407, 409-410; 166 NW2d 624 (1968). This Court explained:

> The use of blackboards, charts and other visual aids at a trial is common practice. Counsel for both sides should be encouraged to present their case in a way that will be most clearly understood by the jury. The extent to which visual aids can be used, when and whether they are to be marked for the record and the comment to be made by preliminary or final instructions that such drawings, charts, or calculations are not evidence rests within the sound discretion of the trial court. [*Id.*]

Likewise, our Supreme Court held that it was not error for the prosecution to use figures on a blackboard that the prosecution believed were supported by the evidence. *People v Potter*, 213 Mich 301, 307; 182 NW2d 144 (1921). Defendant does not assert that the prosecutor mischaracterized the evidence presented at trial in the PowerPoint presentation or otherwise challenge the substance of the PowerPoint presentation. Defendant only asserts that the prosecution erroneously used a PowerPoint presentation during closing argument. However, such a visual aid is permitted. See *Potter*, 213 Mich at 307; *Campbell*, 15 Mich App at 409-410.

Finally, defendant argues that the prosecution engaged in misconduct during closing argument by commenting on defendant's actions and reactions. Defendant does not recite the purported instances of prosecutorial misconduct but instead provides a string of transcript citations. In fact, beyond raising this issue, defendant did little to explain how each cited remark was an instance of prosecutorial misconduct and does not cite legal authority addressing analogous instances of prosecutorial misconduct; therefore, this issue is abandoned. See *Matuszak*, 263 Mich App at 59.

## B. INEFFECTIVE ASSISTANCE OF COUNSEL

Defendant raises several ineffective-assistance-of-counsel claims, including some related to assertions of discovery violations and prosecutorial misconduct already addressed by this Court.

After reviewing each claim, we disagree that trial counsel rendered ineffective assistance of counsel.[6]

Defendant failed to preserve any of his claims of ineffective assistance of counsel in his Standard 4 brief by moving for a new trial or evidentiary hearing in the trial court or in this Court. See *People v Abcumby-Blair*, 335 Mich App 210, 227; 966 NW2d 437 (2020); *People v Lane*, 308 Mich App 38, 68; 862 NW2d 446 (2014). Accordingly, our review is limited to mistakes apparent on the record because no evidentiary hearing was held below. See *id*.

Briefly restated, to establish a claim for ineffective assistance of counsel, a defendant must show that "(1) counsel's performance fell below an objective standard of reasonableness and (2) but for counsel's deficient performance, there is a reasonable probability that the outcome would have been different." *Trakhtenberg*, 493 Mich at 51.

First, defendant claims that trial counsel was ineffective for not challenging the prosecution's failure to turn over a video recording of defendant's police interview with Trooper Baublit. As discussed earlier, defendant failed to demonstrate any error in this regard because a video recording of the police interview did not exist. Instead, a separate audio recording was admitted at trial. Likewise, defendant failed to assert how the police or prosecution tampered with the audio recording such that defendant was prejudiced by the audio recording's admission. Any objection that defense counsel could have made to a discovery violation or *Brady* violation would have been meritless. See *Matuszak*, 263 Mich App at 58. Accordingly, defendant failed to establish that trial counsel's performance fell below an objective standard of reasonableness in this regard.

Second, defendant claims that trial counsel was ineffective for failing to investigate and retain a number of witnesses, including an expert witness, babysitters who watched defendant's children, defendant's colleagues from work, and a number of police officers and investigators involved in the investigation of defendant. We disagree.

"An attorney's decision whether to retain witnesses, including expert witnesses, is a matter of trial strategy." *People v Payne*, 285 Mich App 181, 190; 774 NW2d 714 (2009). "Without some indication that a witness would have testified favorably, a defendant cannot establish that counsel's failure to call the witness would have affected the outcome of his or her trial." *People v Carll*, 322 Mich App 690, 703; 915 NW2d 387 (2018).

---

[6] Defendant also argues in his Standard 4 brief that trial counsel failed to subject his case to meaningful adversarial testing, invoking the alternative analysis of ineffective assistance of counsel under *United States v Cronic*, 466 US 648, 659; 104 S Ct 2039; 80 L Ed 2d 657 (1984). Defendant's invocation of this alternate analysis is not well-taken because defendant does not argue that trial counsel completely failed to advocate for defendant. Instead, defendant cites specific points in the proceeding to indicate that trial counsel's performance was ineffective. See *People v Frazier*, 478 Mich 231, 244; 733 NW2d 713 (2007) ("The *Cronic* test applies when the attorney's failure is *complete*, while the *Strickland* test applies when counsel failed at specific points of the proceeding."). Accordingly, review of these issues under *Strickland* is appropriate.

Defendant contends that trial counsel should have called an expert at trial. Defendant does not assert what type of expert trial counsel failed to retain. Further, defendant does not assert how that expert would assist his defense strategy or rebut the prosecution's witnesses. Given that defendant only baldly asserts that trial counsel should have retained an expert witness, this Court is left with very little information to address defendant's argument on appeal. Cursory treatment constitutes abandonment of the issue. See *Matuszak*, 263 Mich App at 59.

Next, defendant contends that trial counsel should have called his children's babysitters, who would be able to testify about what they saw in defendant's home when babysitting his children. No mistake is apparent from the record, see *Lane*, 308 Mich App at 68, and defendant has provided no indication as to what testimony these babysitters would have provided at trial. Although the record reveals that trial counsel did not call any babysitters, trial counsel developed testimony regarding the family's use of babysitters. With no indication as to what testimony these babysitters may have provided at trial, we cannot conclude that trial counsel's decision to develop testimony regarding the use of babysitters rather than calling babysitters to testify was unsound. See *Trakhtenberg*, 493 Mich at 51.

Next, defendant contends that trial counsel should have called his work colleagues to testify at trial in support of defendant's character and to provide defendant's work schedule. The record indicates that trial counsel did this. Trial counsel called Edward Reust and Chad Sperry. Both testified that they worked with defendant and detailed his work schedule. This record rebuts defendant's assertion that trial counsel failed to investigate and call defendant's colleagues to testify about his character and work habits. Trial counsel was not ineffective because he did exactly what defendant asserts he failed to do at trial. To the extent that defendant is asserting that trial counsel should have called additional colleagues, defendant does not explain what else additional colleagues would testify about that Reust and Sperry did not already cover. Accordingly, defendant failed to establish the first prong of *Strickland*. See *id*. at 51.

Next, defendant contends that trial counsel was ineffective for failing to call various officers and investigators such as Children's Protection Services and the Department of Health and Human Services agents associated with the investigation of KG's claims. This argument is abandoned because defendant provides no analysis as to how any of these individuals would have testified at trial. See *Matuszak*, 263 Mich App at 59.

Defendant also briefly states that trial counsel was ineffective because he failed to properly question the prosecution's witnesses. Defendant makes no effort to cite the record or describe how trial counsel failed to question the prosecution's witnesses. Review of the lower court record shows that trial counsel cross-examined the prosecution's witnesses. Such cursory treatment of this issue leaves this Court with no ability to address it on appeal. See *id*.

Third, defendant claims that trial counsel failed to investigate mitigating and exculpatory evidence. In support of this assertion, defendant only points to trial counsel's line of questioning during cross-examination of police officers in which trial counsel questioned officers about warrants executed for defendant's bank accounts, e-mail address, and cellular devices. This issue is abandoned, see *id*., because defendant does not assert how any of these records contained mitigating or exculpatory evidence. Regardless, after review of the record, there is no indication that trial counsel did not investigate these records and decide not to admit them at trial after

determining that they would not assist his defense strategy. Trial counsel's decision regarding what evidence to present is a matter of trial strategy. *People v Dixon*, 263 Mich App 393, 398; 688 NW2d 308 (2004).

Fourth, defendant claims that trial counsel provided ineffective assistance when he failed to state a peremptory challenge to a juror biased toward the prosecution. In support of this assertion, defendant contends that the juror was neighbors with the prosecutor. During voir dire, the trial court asked Juror 1 if he knew anyone involved in the case. The juror responded that he knew the prosecutor and his family. The trial court followed up by inquiring if the juror had ever eaten dinner at the prosecutor's house or if the prosecutor had ever come to his house for dinner. Juror 1 answered "no." Then, after noting that the trial took place in a small county, the trial court asked Juror 1 if he could be fair and impartial. Juror 1 answered "yes."

"[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, indifferent jurors." *Unger*, 278 Mich App at 254 (quotation marks omitted; alteration in original), quoting *Irvin v Dowd*, 366 US 717, 722; 81 S Ct 1639; 6 L Ed 2d 751 (1961). Both the United States Constitution and our Constitution entitle a defendant to a trial by an impartial jury. US Const, Am IV; Const 1963, art 1, § 20. "Jurors are presumptively competent and impartial, and the party alleging the disqualification bears the burden of proving its existence." *People v Johnson*, 245 Mich App 243, 256; 631 NW2d 1 (2001). " 'It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " *Id*., quoting *Irvin*, 366 US at 723.

"Perhaps the most important criteria in selecting a jury include a potential juror's facial expressions, body language, and manner of answering questions." *Unger*, 278 Mich App at 258. Reviewing courts "cannot see the jurors or listen to their answers to voir dire questions." *Id*. (quotation marks and citation omitted). Therefore, "this Court has been disinclined to find ineffective assistance of counsel on the basis of an attorney's failure to challenge a juror." *Id*.

Defendant failed to establish that Juror 1 was biased toward the prosecution. First, nothing in the record supports that Juror 1 was the prosecutor's neighbor. Instead, Juror 1 only stated that he knew the prosecutor. Any suggestion of a close relationship was undercut by Juror 1's statement that he was not familiar enough with the prosecutor such that he would spend time having dinner with the prosecutor. Nothing in the record suggests that Juror 1 was biased toward the prosecution. Further, Juror 1 assured the trial court that he could be impartial. This indicated that he understood his duty to set aside any bias and decide the case on the evidence presented at trial alone. See *Johnson*, 245 Mich App at 256. After watching this interaction, trial counsel also asked Juror 1 if an innocent man could be on trial. Trial counsel watched the interaction between the juror and the trial court and heard the juror express that he was capable of being impartial. Trial counsel was in a better position than this Court to watch the juror's facial expressions, body language, and tone. See *Unger*, 278 Mich App at 258. Trial counsel did not need to challenge the juror after he assured the trial court that he could be impartial. See *id*. Accordingly, trial counsel's performance did not fall below an objective level of reasonableness when he failed to challenge this juror. See *Trakhtenberg*, 493 Mich at 51.

Fifth, defendant claims that trial counsel provided ineffective assistance of counsel when he failed to impeach witnesses with prior inconsistent statements. Outside of defendant's assertion

that trial counsel was ineffective for failing to impeach WG with inconsistent statements, this issue is abandoned. See *Matuszak*, 263 Mich App at 59. Even with regard to WG's statements, defendant failed to specifically cite the transcripts to support his argument. We overlook this and review defendant's claim.

"When a witness claims not to remember making a prior inconsistent statement, he may be impeached by extrinsic evidence of that statement." *People v Jenkins*, 450 Mich 249, 256; 537 NW2d 828 (1995). Defendant's claim that trial counsel failed to effectively cross-examine WG is rebutted by the record, which indicates that trial counsel vigorously cross-examined WG and explored inconsistencies in his recollection of the case. For example, trial counsel elicited testimony that WG did not tell anyone that he saw defendant and KG sleep together in the same bed in 2015 when defendant was under investigation. And trial counsel elicited testimony that WG did not tell a children's assessment center interviewer even when specifically asked about sleeping arrangements. Further, trial counsel elicited testimony that WG spoke about this case to KG and her mother when he was subpoenaed for trial.

Through this line of questions, trial counsel developed testimony that WG had not told investigators about the sleeping arrangements in the past and that he recently discussed the details of the incidents giving rise to this case with KG and his mother. This testimony gave the jury a basis to reject WG's testimony that he independently saw KG and defendant sleep in the same bed, which is exactly what defendant asserts that trial counsel failed to do. Thus, the jury could have deemed WG not credible and could have rejected his testimony. See *Unger*, 278 Mich App at 228-229. Trial counsel is not ineffective simply because this strategy did not succeed. *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020). Accordingly, defendant has failed to establish the first prong of *Strickland*. See *Trakhtenberg*, 493 Mich at 51.

Sixth, defendant claims that trial counsel was ineffective for failing to object to the prosecution usurping the trial court's role to instruct the jury and for using a PowerPoint presentation during closing argument. As discussed earlier, defendant failed to demonstrate any error in this regard; thus, any objection defense counsel could have made would have been meritless. See *Matuszak*, 263 Mich App at 58. Accordingly, defendant failed to establish that trial counsel's performance fell below an objective standard of reasonableness in this regard.

Affirmed, but we remand this matter for the trial court to articulate its rationale for imposing a consecutive sentence. We do not retain jurisdiction.

/s/ Mark J. Cavanagh
/s/ Kirsten Frank Kelly
/s/ Michelle M. Rick